UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.R. BARD, INC., and DAVOL INC.,

Plaintiffs,

v.

STRYKER CORPORATION,

Defendant.

C.A. No. 02- 515ML

**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT**

Pursuant to Fed. R. Civ. P. 56, plaintiffs C.R. Bard, Inc. and Davol Inc. (collectively, "Davol") hereby move for summary judgment that defendant Stryker Corporation ("Stryker") infringes claims 9, 10, 20, 21, 23, 24, 26, 28, and 30 of U.S. Patent No. 6,485,452 ("the '452 patent"). The material facts concerning the structure and function of Stryker's InterPulse system are not in dispute; indeed, in connection with its motion for summary judgment of non-infringement, Stryker has conceded facts that establish most of the elements of infringement. The only remaining issue is the legal issue of the proper construction of a single claim element that appears in virtually identical form in each of the independent claims in suit, claims 9, 10, and 30. Therefore this cross-motion turns on the construction of that specific element. Properly construed, that claim element – and each other claim element – reads directly on the accused Stryker InterPulse device. Davol is, accordingly, entitled to summary judgment of infringement.

A Memorandum in supporting Davol's motion and also opposing Stryker's motion for summary judgment is attached, together with supporting exhibits.

Dated: July 27, 2005

C.R. BARD, INC., and DAVOL INC.

By their Attorneys,

Mark A. Pogue (#3441)
Armando E. Batastini (#6016)
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)

Claire Laporte (admitted *pro hac vice*)
Mitchell J. Matorin
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Tel. (617) 832-1000

Joseph Avanzato, Esq.
ADLER, POLLOCK & SHEEHAN
2300 Financial Plaza
Providence, RI 02903

<u>VIA FEDEX</u>
Gregory J. Vogler, Esq.
Sharon A. Hwang, Esq.
McANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| C.R. BARD, INC., and DAVOL INC.,<br>Plaintiffs,<br>v.<br>STRYKER CORPORATION,<br>Defendant. | CIVIL ACTION No. 02-515ML |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO STRYKER'S RENEWED MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OR INVALIDITY AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT**

Mark A. Pogue (#3441)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Tel. (401) 274-9200
Telecopy (401) 276-6611

Claire Laporte (*admitted pro hac vice*)
Mitchell J. Matorin
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Tel. (617) 832-1000

*Attorneys for plaintiffs C.R. Bard, Inc. and Davol Inc.*

Dated: July 27, 2005

**Introduction**

Stryker's misguided motion for summary judgment of non-infringement or invalidity is without merit and must be denied. Stryker gets one thing right: on the question of infringement, there are no factual issues in dispute. Accordingly, C.R. Bard and Davol (collectively "Davol") have cross-moved for summary judgment of infringement. After this Court has rejected Stryker's nonsensical claim construction and reviewed Stryker's frank admissions regarding the structure and function of its product, it will be apparent that Davol is entitled to a judgment of infringement as a matter of law on its cross-motion.

If the Court rules in Davol's favor on the infringement issues, it will then need to resolve Stryker's baseless contention that Davol's '452 patent is invalid because Davol has purportedly "sued the prior art." In advancing this argument, the "prior art" Stryker relies on is an early design for Stryker's InterPulse device. In fact, the evidence of record shows that the early design Stryker now relies on is fundamentally different from the infringing product Stryker now sells. Stryker jettisoned that early design after receiving negative feedback from potential customers. Thus, Stryker cannot demonstrate the absence of factual disputes entitling it to judgment of invalidity as a matter of law.

This brief is divided into two sections. In the first section, Davol addresses the claim construction and infringement issues. In the second section, Davol addresses Stryker's frivolous invalidity arguments. The undisputed facts concerning the structure of Stryker's product are set forth in Section I below, after the discussion of the appropriate construction of the patent claims, because the meaning of the claims determines which facts are and are not material. Because the facts underlying Stryker's development of its InterPulse device and Davol's conception of the invention claimed in the '452 patent are relevant only to the invalidity issues, that factual background is set forth in Section II of this brief.

## SECTION I: CLAIM CONSTRUCTION AND INFRINGEMENT

### I. Stryker's Tortured Claim Construction Is Plainly Incorrect.

Stryker's motion focuses on the construction of a single claim element that appears in similar, though not identical, form in each of the three independent claims in suit, 9, 10, and 30. Stryker argues that, if the Court adopts its claim construction argument, it is entitled to summary judgment because its InterPulse product lacks that one claim element. Therefore, if the Court rules in Davol's favor on the construction of that single claim element, it need go no further to deny Stryker's motion for summary judgment of non-infringement.[1]

Claims 9 and 30 describe medical irrigation devices, while claim 10 describes a method of using such a device. All three claims at issue focus on the path that spent irrigation fluid follows when it is suctioned away from the irrigation site through the suction tube of the tip. The device described in claims 9 and 30 requires that the aspirated fluid be channeled "***externally of the handpiece***." The method described in claim 10 requires that the aspirated fluid be directed along a path that is "disposed ***exteriorly of the handpiece***." The advantage of such a fluid path is that, because contaminated irrigation fluid is not suctioned through the handpiece body, the contaminated tip may be removed, permitting the handpiece itself to be reused for a subsequent treatment without danger of contamination to the patient. This ability to reuse the handpiece without fear of contamination is of great importance in the wound care field, where patients typically require multiple irrigation treatments, and reusable handpieces greatly reduce the per-treatment cost.

[1] In order to decide Davol's cross-motion for summary judgment of infringement, of course, Davol will have to establish both the proper construction of each other claim element and the existence of each such element in the accused InterPulse device.

The ordinary meaning of the claim elements italicized in the previous paragraph is simple and straightforward: the aspirated irrigation liquid must not enter the handpiece body. The parties' positions with respect to this claim language are reflected in the table below.

| | **Claim Language** | **Davol's "Plain Language" Interpretation** | **Stryker's Desired Interpretation** |
|---|---|---|---|
| **Claims 9 & 30** | the suction tube having a fluid path that channels aspirated irrigation fluid externally ***of the handpiece*** and directly to a suction source | the suction tube having a fluid path that channels aspirated irrigation fluid externally ***of the handpiece*** and directly to a suction source | a tip suction tube having a fluid path that diverts aspirated irrigation fluid outside ***of the handpiece suction tube*** and directly to a suction source (Br. p. 6) |
| **Claim 10** | directing the aspirated irrigation fluid along a path that is disposed exteriorly ***of the handpiece*** | directing the aspirated irrigation fluid along a path that is disposed exteriorly ***of the handpiece*** | the tip suction tube directs the aspirated fluid along a separate path outside ***of the handpiece suction tube*** (Br. p. 10-11) |

(All emphases in table added to highlight contrast.) As is apparent, Davol's position is that the claim language should be given its ordinary meaning. Stryker's position is that the Court should interpret the claim as requiring a handpiece that has an internal suction tube that is bypassed, even though such a structure is not recited anywhere in claims 9, 10, or 30 and would serve no purpose at all. Stryker's only hope of evading a judgment of infringement lies in persuading this Court that the simple claim language "of the handpiece" should be read to mean "of the handpiece suction tube."[2] This argument runs roughshod over the plain language of the claim as

[2] Indeed, Stryker's proposed construction also affects the claim element "handpiece having an irrigation lumen extending therethrough." If the Court were to adopt Stryker's proposed construction of the claim elements set forth in the text, it would effectively also be construing this element as "handpiece having an irrigation lumen *and a suction lumen* extending therethrough." Such a construction would be manifestly incorrect as a linguistic matter, and it also would violate the doctrine of claim differentiation for the reasons set forth in the text.

well as the controlling law of claim construction. There is nothing in the claim language, the patent specification, or the prosecution history that would permit such an interpretation.

A. The Claim Language Neither Suggests Nor Permits Stryker's Interpretation.

"Claim construction begins with the words of the claim." *Prima Tek II, LLC v. Polypap, S.A.R.I.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998)). The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, Nos. 03-1269, 03-1286, 2005 WL 1620331, at *5 (Fed. Cir. July 12, 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582).[3] In some cases, as in this one, "the ordinary meaning of claim language ... may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at *6.

As shown above, nothing in the claims themselves suggests that the term "handpiece" should be interpreted to mean "handpiece suction tube." Indeed, all the evidence is that the claims should be interpreted to mean exactly what they say. In its recent *en banc* decision in *Phillips,* the Federal Circuit emphasized that the meaning of words in a claim may be illuminated by examining other words in the claim in question. *Id.* at *7. Here, all three claims describe the handpiece to which the tip is to be connected. In each case, the handpiece has an irrigation lumen, but there is ***no mention*** of a suction lumen, the structure Stryker wants to read into the claim. In claim 9, for example, the handpiece is described as "having an irrigation lumen extending therethrough, a trigger ... and a connector for connection to the discardable tip."

[3] The *Phillips en banc* court placed emphasis on how the words would be understood to one of ordinary skill in the art. Plaintiffs do not believe that the dispute between the parties relates to any specialized knowledge in the art; the dispute relates to the proper interpretation of the intrinsic evidence, *i.e.*, the claims, the specification, and the prosecution history.

The *Phillips* court likewise emphasized that "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* at *7. The claims in suit recite only a handpiece having an irrigation lumen extending therethrough. By contrast, claims 4, 8, and 11 each recite a handpiece having both an irrigation lumen and a suction lumen extending therethrough, while claim 1 recites a handpiece having a suction lumen extending therethrough, but not an irrigation lumen. Given that numerous claims explicitly recite a suction lumen in the handpiece, and that the claims in suit do not, it is clear that it would be improper to import a suction lumen into the claims plaintiffs assert against Stryker.

B. The Specification Does Not Support Stryker's Proposed Construction.

Stryker relies heavily on the patent specification in support of its attempt to convince the Court that the claims in suit require that the handpiece contain an internal suction lumen. The Federal Circuit frowns upon such efforts to read limitations from the specification into the claims. That court "has repeatedly and clearly held that it will not read unstated limitations into claim language." *Rambus, Inc. v. Infineon Technologies, AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003) (quoting *Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000)); *see also Prima Tek II, supra,* 318 F.3d at 1148; *Teleflex, supra,* 299 F.3d at 1326. The Federal Circuit reaffirmed this principle as recently as two weeks ago when it stated, "[A]l-though the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 2005 WL 1620331, at *15.

Thus, while the specification is critical to an understanding of disputed claims, *see id.* at *7, the embodiments disclosed in the specification are illustrative, rather than limiting. In *Phillips* itself, the Federal Circuit reversed the district court's claim construction because it improperly limited the claims to an illustrative embodiment disclosed in the specification. The

disputed claims recited simply "steel baffles" within modular wall panels, but the district court had incorrectly required that these baffles be deployed, as in the disclosed embodiment, at angles other than right angles to the wall faces. In reversing this claim construction, the court reiterated that illustrative functions or features of the disclosed embodiment do not limit the claims themselves. *Id.* at *17-*18. Indeed, the *Phillips* court cited only two circumstances when the specification may limit the scope of claim terms: (1) when the specification "reveal[s] a special definition given to a claim term by the patentee" or (2) when it "reveal[s] an intentional disclaimer, or disavowal, of claim scope." *Id.* at *8. As the Federal Circuit held in *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003), "The danger of improperly importing a limitation is even greater when the purported limitation is based upon a term not appearing in the claim. 'If we once begin to include elements not mentioned in the claim in order to limit such claim ..., we should never know where to stop.'" *Amgen*, 314 F.3d at 1325 (quoting *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999)); *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("it is manifest that a claim must explicitly recite a term in need of definition before a definition may enter the claim from the written description.").

Here, the specification does not explicitly or even implicitly define any claim term differently from its ordinary meaning. Indeed, the specification makes clear that the focus of the invention is on avoiding contamination of the handpiece, not requiring that the handpiece have a particular structure – a suction lumen – that is not used. The specification, like some of the claims, does refer to a suction lumen in the handpiece. That is because one advantage of the invention is that it can be used to adapt conventional handpieces having interior suction lumens

for reuse. The invention is not so narrow as to be limited to such handpieces, however, as the plain wording of the claims in suit makes clear.

Indeed, the specification *expressly* contemplates handpieces that have only irrigation tubes, as well as handpieces having both irrigation and suction tubes. Thus, the patent describes the prior art as including both "irrigation devices," which generally comprise an "irrigation handpiece and accompanying irrigation tip" (*see* Col. 1:17-22)[4], and "conventional irrigation and suction devices," which have a "handpiece having both irrigation and suction lumens." (*See* Col. 1:26-29.) In describing the preferred embodiment of the invention, the specification points to Fig. 1 of the patent as showing a "conventional handpiece," and notes that "such a handpiece ***may also include*** a suction tube **20** extending into the interior of the handpiece **10** ...." (Col. 3:23-3:30; italics added.) This permissive language makes clear that the handpiece ***may*** include such a suction tube, but it also ***may not*** include one. *See Prima Tek II*, 318 F.3d at 1150 ("The written description only states that the floral holding material 'may be' (not must be) the type of material commonly referred to in the art as floral foam or soil").

Stryker argues that several portions of the specification support its argument that the handpiece must contain an internal suction lumen. But even if the Court were to ignore the law against importing limitations into a claim from the specification, none of the cited passages would affect the conclusion that the handpiece need not have a suction lumen. At page 7 of its Brief, Stryker refers to the Summary of the Invention (Col. 2:17-2:24), which notes that:

> In accordance with one aspect of the invention, the suction lumen in a detachable suction and irrigation tip is configured so that aspirated fluid and debris are passed directly to an external suction source ***when the tip is used with a conventional handpiece having both suction and irrigation lumens***. No portion of the suction

[4] Cites to the '452 patent are by column and line number. The patent appears as Exhibit B to Stryker's brief, while the Reexamination Certificate appears as Exhibit A thereto.

> lumen in the tip is in fluid communication with the suction lumen in the handpiece.

(Emphasis added). As the italicized language demonstrates, however, the specification here is describing how the invention operates "*when* the tip is used with a ***conventional handpiece having both suction and irrigation lumens***." Because this portion of the specification uses the word "when," it is clear that there may be circumstances other than the one described – *i.e.*, when the tip is used with another kind of handpiece. Consequently, it makes no sense to argue, as Stryker does, that an internal suction lumen is required by the claims.

The other passages of the specification cited by Stryker support plaintiffs' position that claims 9, 10, and 30 refer simply to devices or methods in which the aspirated liquid and surgical debris avoid the interior of the handpiece. Thus, Col. 2:53-2:56 says only that aspirated debris "bypasses the handpiece"; Col. 3:31-34 describes the debris as diverted "away from the interior of the handpiece **10**, thus reducing the risk of contaminating the handpiece **10**"; and Col. 4:3-7 notes that "[a]spirated debris therefore never enters the handpiece **10.**" Stryker misleadingly asserts that this language "emphasizes that the handpiece suction tube is never used" (Stryker Br. at 8). In fact, these quoted passages never mention a handpiece suction tube. While a handpiece suction tube is mentioned in the Abstract and at Col. 6:46-52, these references merely illustrate that the claimed invention may be used with a handpiece that includes a suction tube.[5]

Nothing in the specification contradicts the clear and unchallenged meanings of the simple, straightforward words used in claims 9, 10, and 30. For this reason, and because the

---

[5] In addressing claims 9 and 30, Stryker supplements its argument with a dictionary definition of the word "directly." It argues that this word "*suggests* that the tip suction tube channels aspirated fluid directly to the suction source without ever entering the handpiece suction tube." (Stryker Br. at 7, italics added, underlining in original.) Stryker thus seeks to read into the dictionary definition of "directly" an implicit requirement that the handpiece have an internal suction lumen. The Court should reject this attempt to redefine the plain English word "directly."

claims contain no word or phrase that requires or permits introduction of an entirely extraneous concept, the Court should reject Stryker's effort to narrow the plain language of the claims.

C. Stryker Misrepresents And Misuses The Prosecution History.

Stryker cites a single parenthetical comment in the prosecution history in support of its contention that – even though the only limitation of the handpiece recited in the claims in suit is that it has "an irrigation lumen extending therethrough" – the handpiece must also contain an internal suction lumen. (Stryker Br. at 10.) Stryker ignores the well-established rule that statements made in prosecuting a patent may result in the surrender of some portion of the scope of the patent claims only if that surrender is "both so clear as to show reasonable clarity and deliberateness . . . and so unmistakable as to be unambiguous evidence of disclaimer." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003). Moreover, the statement must have been made in order to obtain claim allowance, whether by express amendment to narrow the claim scope or by argument. *Id.* at 1324; *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). As shown below, the single parenthetical comment upon which Stryker relies does not even approach the level needed to deprive plaintiffs of the full scope of the ordinary meaning of the claims.

The '452 patent is a continuation of U.S. Pat. No. 6,200,292 (the "'292 patent"), issued on March 13, 2001, based on Bard's initial 1996 patent application. When Bard filed the continuation application, it initially filed a Preliminary Amendment canceling the claims already allowed by the patent office in the '292 patent and adding certain new claims, including 23 and 24 (now claims 9 and 10). (*See* Exh. 1.)[6] The discussion section of the Preliminary Amendment began with a "Summary of the Invention" which states, in relevant part:

---

[6] Numbered exhibits refer to exhibits attached hereto.

> To irrigate such a sore with applicant's invention, a suction and irrigation tip is selected and is detachably connected to a reusable handpiece 10. (see Figs. 1 and 3 below). The handpiece may have … an internal irrigation lumen 24 for communicating irrigation liquid with the tip. (5:23-6:8) *The handpiece also may have a suction lumen 22*. An object of the invention is to reduce the risk of contamination of the handpiece 10 by spent irrigation liquid, body fluids and debris aspirated through the suction lumen 22 of the tip 16 so that the handpiece can be reused in a subsequent procedure with a fresh tip. The invention provides an arrangement by which the flow path of aspirated material is diverted away from and bypasses the handpiece. To that end, the detachable tip 16 has a suction tube 46 with a conduit 60 that defines a fluid bypass path that *prevents aspirated material from being channeled into contact with the handpiece 10 and its suction lumen 22 (see all claims). The handpiece* thus does not become contaminated and may be used again, thereby reducing the cost of treatment.

(Exh. 1 at 4-5) (emphasis added).

Stryker contends that the above-quoted parenthetical "(see all claims)" somehow justifies ignoring the plain language of claims 9, 10, and 30, because it limits all claims to a handpiece with a suction lumen.[7] This argument is plainly wrong. As an initial matter, the passage immediately preceding the "(see all claims)" parenthetical expressly states, "The handpiece also ***may*** have a suction lumen 22." (Emphasis supplied.) This implies not that the handpiece ***must*** have a suction lumen, but that it ***may or may not.*** Similarly, the passage also states, "The invention provides an arrangement by which the flow path of aspirated material is diverted away from and ***bypasses the handpiece***." It does not state that the aspirated material bypasses a handpiece suction tube.

In fact, the phrase "(see all claims)" does not imply that the handpiece referred to in each claim must contain a suction lumen. The phrase forms part of a general description of the

[7] Stryker also asserts (Stryker Br. at 10) that this statement was made "in an attempt to overcome cited prior art." This is simply untrue. The statement was a summary description provided at the outset of the continuation process, and was not made or relied on to overcome prior art cited by the examiner in an office action rejection.

purpose of the invention, which provides an arrangement in which the aspirated irrigation fluid "bypasses *the handpiece*" so that "*the handpiece* does not become contaminated." In stating that the bypass fluid path "prevents aspirated material from being channeled into contact *with the handpiece and its suction lumen 22 (see all claims)*," Bard's counsel presumably meant to convey that this arrangement – *i.e.*, in which the irrigation fluid bypasses the interior of the handpiece (including an internal suction lumen if one is present) – was present in all claims.[8] Certainly, the parenthetical "(see all claims)" does not come close to a "clear" or "unmistakable" disclaimer of claim scope. *See Omega Eng'g*, 334 F.3d at 1324-35 and cases cited (no disclaimer where language is inconclusive or open to multiple interpretations); *cf. Standard Oil Co.*, 774 F.2d at 452 (finding disclaimer of metallic copper where applicant stated during prosecution, "metallic copper ... is outside [the] claims").

Stryker notes that, in a later response to a rejection of the pending claims as anticipated by a particular reference (Sorenson), Bard repeated the "Summary of the Invention" verbatim. (*See* Stryker Br. at 10.) This repetition does not transform the parenthetical "(see all claims)" into a "clear and unmistakable" disclaimer, any more than it was a clear and unequivocal disclaimer the first time. In fact, the arguments made to distinguish Sorenson support the conclusion that claims 9, 10, and 30 do not require a handpiece that contains both a suction lumen and an irrigation lumen. With respect to application claim 23 (issued claim 9), Bard

[8] In any event, even if the inventors had stated that "all" of the patent claims required a handpiece with a suction lumen, such a statement would not limit the scope of claims 9, 10, and 30 because it would be inaccurate on its face. In *Rambus*, the patentee submitted new claims after a rejection. In accompanying remarks, the patentee stated that the new claims were directed to a device that had three specific elements. In fact, though most of the new independent claims recited those three elements, one of the new claims recited only one of them. Citing the patentee's statement, the district court construed the fourth claim to require the two unrecited elements. 318 F.3d at 1089. The Federal Circuit reversed, noting that "the imprecise statement in the prosecution history does not limit claim 26. The claim language itself controls the bounds of the claim, not a facially inaccurate remark during prosecution." *Id.* at 1090. *Accord, Intervet-America*, 887 F.2d 1050 (Fed. Cir. 1989) (inaccurate statements in prosecution did not limit claims).

argued that Sorenson did not disclose an arrangement "in which there is a fluid path that channels aspirated irrigation fluid externally of the handpiece." (Exh. 2 at 8.) Bard made the same argument with respect to application claim 24 (issued claim 10). (*Id.* at 9.) Bard did not say that the invention required that the aspirated irrigation fluid be channeled externally of a handpiece suction lumen. Thus, nothing in the discussion of Sorenson constituted a disclaimer of the literal scope of the claims.

The *en banc Phillips* court recently reiterated that, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 2005 WL 1620331, at *9 (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (ambiguity of prosecution history made it less relevant to claim construction); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguity of prosecution history made it "unhelpful as an interpretive resource" for claim construction)). The prosecution history here lacks the clarity necessary to conclude that any claim scope has been surrendered.

## II. The Proper Construction of the Claims in Suit

The other elements of the claims in suit are no more complex than the one discussed above. All of them should be interpreted according to their ordinary meaning, with the following limited exceptions.

### A. Claims 9 and 30 and Dependent Claims: "Enabling the Handpiece to Be Reused"

Claims 9, 20, 21, 23, 26, 28, and 30 contain the following limitation: "the suction tube and irrigation tube being detachable together from the handpiece whereby the tip can be discarded, ***enabling the handpiece to be reused***." (Emphasis supplied.) "Enabling the handpiece to be reused" means "enabling the handpiece to be reused ***because it remains***

***aseptic***." This extra limitation must be added to make sense of the claim, because as a matter of simple physical structure, any handpiece can be reused as long as it continues to have access to a power source. As the patent specification makes clear, the factor limiting the reusability of a handpiece is not a physical limitation of the handpiece; it is that the handpiece is contaminated after use. Thus, the specification explains, a problem for conventional irrigation devices is that

> the biological debris ingested into the handpiece suction lumen … may contain infectious bacteria that could contaminate the handpiece. The handpiece can thus become septic …. Accordingly, although irrigation handpieces with detachable tips are available, there has been a resistance to their use because the handpieces are relatively expensive ***and can only be used once***.

Col. 1:43-1:51. The benefit of the invention was that the inventive tips could be "detachably connected to an irrigation handpiece in which the risk of the handpiece becoming contaminated with biological debris is reduced." Col. 2:57-2:62. Thus, the claim phrase, "enabling the handpiece to be reused," means that the handpiece may be reused ***because it is aseptic***.

B. Claim 30: "Means For Causing Irrigation Liquid to Be Emitted From the Tip…"

Claim 30 contains the following element: "means for causing irrigation liquid to be emitted from the tip with a force sufficient to remove debris from the irrigation site without substantially damaging healthy tissue." Because this element is drafted in "means for" language, it is a means-plus-function element that must be interpreted in accordance with 35 U.S.C. § 112, ¶ 6, which provides as follows: "An element in a claim for a combination may be expressed as a means or step for performing a specified function … and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Thus, one must not only interpret the function (causing irrigation liquid to be emitted) but also look to the specification to determine what the "corresponding structure" is.

The function recited should be interpreted according to its ordinary meaning. The corresponding structure is readily determined for this claim element. The specification makes

clear that what causes liquid to be emitted from the tip with any number of varying forces is a *pump* (col. 3:39-3:41) and a *plurality of irrigation holes* that may vary in number, shape, and size depending on the pump with which the tip is used (col. 5:21-5:47).[9]

## III. Stryker's InterPulse Product Infringes All Claims In Suit.

The undisputed evidence of record makes it abundantly clear that Stryker infringes all of the claims in suit, when those claims are properly construed. The chart below shows each claim and details the evidence of direct infringement, much of it admitted in Stryker's motion papers.

| **Claim 9** | **Evidence of Infringement** |
|---|---|
| A detachable discardable suction and irrigation tip for use with an irrigation apparatus that comprises a pump to pump irrigation fluid and a handpiece, | "The InterPulse system includes a handpiece, a power source, and disposable, interchangeable tips." Noonan Declaration (Exh. E. to Stryker Br.) ¶ 2. *See also* Annotated Photograph of Stryker's InterPulse system ("Annotated Photo") (Exh. 3). In the Annotated Photo, the suction and irrigation tip is shown at D while the handpiece and internal pump are indicated at G. *See also* Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| the handpiece having an irrigation lumen extending therethrough, | "The InterPulse handpiece includes … an irrigation tube extending through the handpiece …." *Id.* ¶ 3. *See also* Annotated Photo (Exh. 3) at G (handpiece and internal irrigation lumen), A (irrigation lumen at proximal end). |
| a trigger for controlling flow of irrigation fluid | "The InterPulse handpiece includes a trigger to control the flow of irrigation from a source such as an irrigation bag…." *Id.* *See also* Annotated Photo (Exh. 3) at B. |

[9] Lastly, in claims 10 and 24, the "handle" means the handpiece.

| | |
|---|---|
| and a connector for connection to the discardable tip, | "Tip Locking Mechanism -- Effectively engages tip to hand piece for optimal performance." Stryker InterPulse brochure, S 5920. (Exh. 4.) *See also* Annotated Photo (Exh. 3) at C; Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| the tip comprising: an irrigation tube for directing irrigation fluid from the handpiece to the irrigation site; | "The InterPulse handpiece includes a trigger to control the flow of irrigation from a source such as an irrigation bag through ***an irrigation tube extending through the handpiece to a disposable tip, and thereafter to the surgical site.*** " Noonan Decl. ¶ 3 (emphasis added). *See also* Annotated Photo (Exh. 3) at D. |
| a connector for detachably connecting the irrigation tube to the handpiece to provide fluid communication between the irrigation lumen of the handpiece and the irrigation tube; | *See* Noonan Declaration, ¶ 7, "Installation Methods" graphic, step 5 ("Insert the new tip."). *See also* Annotated Photo (Exh. 3) at E; Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| a suction tube for aspirating irrigation fluid from the irrigation site, | "[T]he other end of the suction tubing [along the spine of the InterPulse handpiece] connects to ***a tip suction tube***." Noonan Declaration, ¶ 4 (emphasis added). |
| the suction tube having a fluid path that channels aspirated irrigation fluid externally of the handpiece and directly to a suction source, | "The InterPulse handpiece includes suction tubing along the spine of the handpiece. One end of the suction tubing connects to an external suction source, while the other end of the suction tubing connects to ***a tip suction tube***. The suction tubing is detachably mounted into a groove along the spine of the handpiece to facilitate removal and replacement." *Id.* (emphasis added). *See also* Annotated Photo (Exh. 3) at F. |

| | |
|---|---|
| the suction tube and irrigation tube being detachable together from the handpiece whereby the tip can be discarded, enabling the handpiece to be reused; | "The InterPulse handpiece is reusable. To reuse the handpiece and prevent cross-contamination of the handpiece, used tips [which include both suction and irrigation tubes, see elements above] and used handpiece suction tubing can be disposed of and replaced with new tips and new handpiece suction tubing.... By using a replacement [tip and tubing] set, the handpiece can be used multiple times to clean the wounds of a single patient without the risk of cross-contamination." Noonan Declaration, ¶ 5. *See also* Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| wherein the pump and the tip are configured to emit irrigation liquid from the tip with a force sufficient to remove debris from the irrigation site without substantially damaging healthy tissue, the force resulting from a pressure that does not exceed about 15 p.s.i. | Wound Management<br>**InterPulse**<br>**Safety**<br>A choice of three spray patterns all meet the AHCPR safety guidelines of 4-15 psi. Convenient bedside treatments eliminate the need to ambulate patients and therefore reduce the risk of injury.<br><br>Stryker InterPulse brochure, S 5925. |
| **<u>Claim 10</u>** | **<u>Evidence of Infringement</u>** |
| A method of irrigating an irrigation site and aspirating the irrigation liquid from the aspiration site comprising: | "The InterPulse System is a pulsed lavage system intended for cleansing of a medical, clinical, or surgical site .... The InterPulse handpiece provides controlled irrigation to a surgical site to loosen and float debris for subsequent removal by suction." Noonan Declaration, ¶ 2. |
| Providing a handpiece having an irrigation lumen extending therethrough, | "The InterPulse handpiece includes ... an irrigation tube extending through the handpiece ...." *Id.* ¶ 3. *See also* Annotated Photo (Exh. 3) at G (handpiece and internal irrigation lumen), A (irrigation lumen). |

| | |
|---|---|
| a trigger for controlling flow of irrigation fluid | "The InterPulse handpiece includes a trigger to control the flow of irrigation from a source such as an irrigation bag…." *Id. See also* Annotated Photo (Exh. 3) at B. |
| and a connector portion for connection to a connection portion of a discardable tip; | "Tip Locking Mechanism -- Effectively engages tip to hand piece for optimal performance." Stryker InterPulse brochure, S 5920; *see also* Noonan Declaration, ¶ 7, "Installation Methods" graphic, step 5 ("Insert the new tip."); Annotated Photo (Exh. 3) at C and E (connector portion of handpiece and connection portion of discardable tip); Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| Connecting a detachable tip to the handpiece at the connector, | *See* Noonan Declaration, ¶ 7, "Installation Methods" graphic, step 5 ("Insert the new tip."); *see also* Annotated Photo (Exh. 3) at C; Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| the tip comprising an irrigation tube for directing irrigation fluid from the handle to the irrigation site and a suction tube for aspirating irrigation fluid from the irrigation site; | "The InterPulse handpiece includes a trigger to control the flow of irrigation from a source such as an irrigation bag through ***an irrigation tube extending*** through the handpiece ***to a disposable tip, and thereafter to the surgical site.***" Noonan Decl. ¶ 3 (emphasis added). "[T]he other end of the suction tubing [along the spine of the InterPulse handpiece] connects to ***a tip suction tube***." *Id.* ¶ 4 (emphasis added). *See also* Annotated Photo (Exh. 3) at D, F. |
| Directing irrigation liquid through the irrigation lumen in the handpiece and the irrigation tube of the tip against the irrigation site; | Given the structure of the InterPulse, described above and below, use of the device for wound care necessarily entails this step. *See also* Noonan Decl. ¶ 2. |

| | |
|---|---|
| Aspirating spent irrigation fluid from the irrigation site through the suction tube of the tip | Given the structure of the InterPulse, described above and below, use of the device for wound care necessarily entails this step. *See also id.* ¶ 4; Instructions for Use, S 10339 (Exh. 5). |
| and directing the aspirated irrigation fluid along a path that is disposed exteriorly of the handpiece; | *See* Noonan Decl. ¶¶ 7 & 8 (noting that the suction tubing can hang along the side of the handpiece). *See also* Annotated Photo (Exh. 3) at F. |
| Thereafter detaching the tip, including the irrigation tube and suction tube together from the handpiece and discarding them; and | "To reuse the handpiece and prevent cross-contamination of the handpiece, used tips and used handpiece suction tubing can be disposed of and replaced with new tips and new handpiece suction tubing." Noonan Declaration, ¶ 5; *see also id.*, ¶ 6, which describes "Removal of Used Tip and Suction Tubing."; Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| Attaching an unused discardable suction and irrigation tip to the handpiece in readiness for another procedure. | *See* Noonan Declaration, ¶ 7, "Installation Methods" graphic, step 5 ("Insert the new tip."); *id.*, ¶ 8, "Side Mount Method of Insertion" graphic, step 3 ("Install tip as shown."); Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| **<u>Claim 20</u>** | **<u>Evidence of Infringement</u>** |

| | |
|---|---|
| The tip as defined in claim 9 wherein at least a portion of the fluid path comprises suction tubing detachably connectible to the tip. | "Tip Body - Attaches and detaches with Interpulse Handpiece. The customer discards the used tip, peels away the suction tubing from the Handpiece to discard the contaminated item, and threads the replacement suction tubing w/tip into the Handpiece for a second use." New Product Release dated April 28, 1999, S 1040. *See also* Annotated Photo (Exh. 3) at D (pointing to tip generally) and F (suction tubing); Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| **<u>Claim 21</u>** | **<u>Evidence of Infringement</u>** |
| The tip as defined in claim 20 wherein the suction tube, irrigation tube, and suction tubing are detachable with respect to the handpiece and are discardable together. | "To reuse the handpiece and prevent cross-contamination of the handpiece, used tips and used handpiece suction tubing can be disposed of and replaced with new tips and new handpiece suction tubing." Noonan Declaration, ¶ 5; *see also id.*, ¶ 6, which describes "Removal of Used Tip and Suction Tubing;" Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| **<u>Claim 23</u>** | **<u>Evidence of Infringement</u>** |

| | |
|---|---|
| A device as defined in claim 9 wherein the irrigation lumen extending through the handpiece has an inlet disposed exteriorly of the handpiece and is connectible to a source of irrigation liquid external of the handpiece. | An illustration from Stryker's InterPulse Instructions for Use makes clear that the InterPulse has the structure defined in this element:<br><br>The bag uppermost in the picture is the source of irrigation liquid, which is external to the handpiece (shown at left). The irrigation lumen has an inlet that connects as shown to the irrigation bag. (S 10339). *See also* Annotated Photo (Exh. 3) at A. |
| **<u>Claim 24</u>** | **<u>Evidence of Infringement</u>** |
| A method as defined in claim 10 further comprising the irrigation lumen extending through the handpiece having an inlet that is disposed exteriorly of the handpiece, the inlet being connectible to a source of irrigation liquid. | *See* Claim 23. |
| **<u>Claim 26</u>** | **<u>Evidence of Infringement</u>** |
| The apparatus as defined in claim 9 further comprising a flexible splash shield mounted on the tip. | Concurrent suction with soft cone splash shield for optimal fluid containment without damaging soft tissue.<br><br>Stryker InterPulse brochure, S 5920. (Exh. 4.) *See also* Annotated Photo (Exh. 3) at D (splash shield appears at distal end). |
| **<u>Claim 28</u>** | **<u>Evidence of Infringement</u>** |
| The apparatus as defined in claim 26 wherein the pump is disposed within the handpiece. | *See* Annotated Photo (Exh. 3) at G (indicating handpiece and internal pump). |

| Claim 30 | Evidence of Infringement |
| --- | --- |
| A detachable discardable suction and irrigation tip for use with an apparatus for irrigating an irrigation site, | "The InterPulse system includes a handpiece, a power source, and disposable, interchangeable tips." Noonan Declaration ¶ 2. *See also* Annotated Photo (Exh. 3) at D (detachable discardable suction and irrigation tip generally); Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| the apparatus comprising an irrigation handpiece, having an irrigation lumen extending therethrough | "The InterPulse handpiece includes … an irrigation tube extending through the handpiece …." *Id.* ¶ 3. *See also* Annotated Photo (Exh. 3) at G (indicating handpiece and internal irrigation lumen). |
| a trigger for controlling flow of irrigation fluid | "The InterPulse handpiece includes a trigger to control the flow of irrigation from a source such as an irrigation bag…." *Id.* *See also* Annotated Photo (Exh. 3) at B. |
| and a connector for connection to the discardable tip | "Tip Locking Mechanism -- Effectively engages tip to hand piece for optimal performance." Stryker InterPulse brochure, S 5920. *See also* Annotated Photo (Exh. 3) at C; Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| and means for causing irrigation liquid to be emitted from the tip with a force sufficient to remove debris from the irrigation site without substantially damaging healthy tissue, | "The InterPulse system is a pulsed lavage system intended for cleansing of a medical, clinical, or surgical site…. The InterPulse handpiece provides ***controlled irrigation*** to a surgical site to loosen and float debris for subsequent removal by suction." Noonan Decl. ¶ 2 (emphasis added). |

| | |
|---|---|
| the force resulting from a pressure that does not exceed about 15 p.s.i, | Wound Management<br>**InterPulse**<br>**Safety**<br>A choice of three spray patterns all meet the AHCPR safety guidelines of 4-15 psi. Convenient bedside treatments eliminate the need to ambulate patients and therefore reduce the risk of injury.<br><br>Stryker InterPulse brochure, S 5925. |
| the tip comprising: an irrigation tube for directing irrigation fluid from the handpiece to the irrigation site; | "The InterPulse handpiece includes a trigger to control the flow of irrigation from a source such as an irrigation bag through ***an irrigation tube extending through the handpiece to a disposable tip, and thereafter to the surgical site.***" Noonan Decl. ¶ 3 (emphasis added). *See also* Annotated Photo (Exh. 3) at D. |
| a connector for detachably connecting the irrigation lumen to the handpiece to provide fluid communication between the irrigation lumen of the handpiece and the irrigation tube; | *See* Noonan Declaration, ¶ 7, "Installation Methods" graphic, step 5 ("Insert the new tip."). *See also* Annotated Photo (Exh. 3) at E; Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |
| a suction tube for aspirating irrigation fluid from the irrigation site, | "[T]he other end of the suction tubing [along the spine of the InterPulse handpiece] connects to a ***tip suction tube***." Noonan Declaration, ¶ 4. |
| the suction tube having a fluid path that channels aspirated irrigation fluid externally of the handpiece and directly to a suction source, | "The InterPulse handpiece includes suction tubing along the spine of the handpiece. One end of the suction tubing connects to an external suction source, while the other end of the suction tubing connects to ***a tip suction tube***. The suction tubing is detachably mounted into a groove along the spine of the handpiece to facilitate removal and replacement." *Id.* (emphasis added). *See also* Annotated Photo (Exh. 3) at F. |

| | |
|---|---|
| the suction tube and irrigation tube being detachable together from the handpiece whereby the tip can be discarded, enabling the handpiece to be reused. | "The InterPulse handpiece is reusable. To reuse the handpiece and prevent cross-contamination of the handpiece, used tips [which include both suction and irrigation tubes, see elements above] and used handpiece suction tubing can be disposed of and replaced with new tips and new handpiece suction tubing.... By using a replacement [tip and tubing] set, the handpiece can be used multiple times to clean the wounds of a single patient without the risk of cross-contamination." Noonan Declaration, ¶ 5. *See also* Stryker InterPulse brochure, S 5920 (Exh. 4); Instructions for Use, S 10339 (Exh. 5); Wound Care Tubing Replacement Sets, S 1180 (Exh. 6). |

## IV. Davol Is Entitled To Summary Judgment On Infringement By Equivalents.

As shown above, under proper claim construction, Stryker's InterPulse device manifestly infringes the '452 patent, and the Court need not address infringement under the doctrine of equivalents. However, Davol briefly addresses Stryker's argument on the doctrine of equivalents[10].

A device that does not literally infringe a patent may infringe under the doctrine of equivalents if the device contains each limitation of the claim or its equivalent. A limitation is equivalently present if only "insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.* 285 F.3d 1353, 1359 (Fed. Cir. 2002) (citation omitted). Whether the accused device "performs substantially the same function as the claimed invention in substantially the same way

[10] In order to save space and reduce complexity, we address below the question of doctrine of equivalents as it applies only to the three independent claims in suit, Claims 9, 10, and 30. This is because if Stryker infringes by equivalents any of the independent claims, it is not necessary to analyze the applicability of the doctrine to the dependent claims; and if the Court concludes that Stryker does not infringe the independent claims by equivalents, Stryker cannot infringe the dependent claims either.

to achieve substantially the same result may be relevant to this determination.” *Id.* Here, the function of the claimed invention is for the aspirated irrigation fluid to flow externally of the handpiece, the “way” is to have a fluid path that does not enter the handpiece, and the result is to achieve a handpiece that is reusable because it is not contaminated.

Stryker concedes that its device performs the same function (aspirated irrigation liquid flows externally along the spine of the handpiece), *see* Noonan Decl. ¶¶ 4-9; Stryker Br. at 15, and that it achieves the same result (handpiece reusability without contamination), *see* Noonan Decl. ¶ 5. Stryker attempts to avoid the doctrine of equivalents by arguing that its handpiece performs that function and achieves that result in a different way, namely, by positioning the suction tube of the handpiece so that it runs externally of the handpiece, rather than bypassing a suction tube that is contained within the handpiece. (Stryker Br. at 15.) This is truly a distinction without a difference: if the Court were to (incorrectly) construe the claims as requiring that the handpiece have an internal suction lumen, the only purpose of that suction lumen would be to be bypassed – it would perform no function at all. Having an internal suction lumen whose only purpose is to be bypassed is insubstantially different from not having an internal suction lumen at all.

With respect to claims 9 and 30, Stryker argues that, in the particular embodiment of the invention shown in the specification, “handpiece reusability” is achieved through the use of a tip that has a “plug to prevent aspirated fluid from entering into the suction tube of the handpiece.”[11] (Stryker Br. at 14.) But claims 9 and 30 say nothing about a plug, and a plug is unnecessary if the handpiece has no internal suction tube (which the specification describes as optional). Moreover, Stryker expressly *admits* that the InterPulse achieves the *same result* as claims 9 and

---

[11] The “plug” is another feature of the particular embodiment of the invention depicted in the specification that Stryker seeks to import into claims 9 and 30, which does not require a plug. (Nor does claim 10 require a plug.)

30 – "handpiece reusability." (Stryker Br. at 15.) In sum, even if claims 9 and 30 are incorrectly construed to require an internal suction lumen that is bypassed, the doctrine of equivalents would apply for the reasons discussed above.

As to claim 10, Stryker argues that "directing aspirated irrigation fluid through the tip suction tube to a handpiece suction tube is not equivalent to 'directing the aspirated irrigation fluid along a path that is disposed exteriorly of the handpiece.'" (Stryker Br. at 16.) This argument makes no sense where, as here, the suction tube of the InterPulse is (as Stryker admits, *see* Stryker Br. at 13) "disposed exteriorly of the handpiece." To the extent that Stryker's argument makes any sense, the purported difference is clearly insubstantial.

## SECTION II: STRYKER CANNOT PREVAIL ON ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY BASED ON ITS EARLY INTERPULSE DESIGN

Stryker argues that Davol "sued the prior art" and that the '452 patent is invalid because Stryker's early design for its accused InterPulse device purportedly anticipates the Davol invention. Stryker misrepresents the nature of its early InterPulse. The evidence of record shows that the device Stryker disclosed to the FDA in its 1995 510(k) submission substantially differed from the infringing product Stryker now sells. In fact, after Davol's invention date, Stryker jettisoned its design in the face of negative feedback from potential customers. Stryker then redesigned its irrigator and ultimately – in early 1998, nearly two years after Davol launched its own product – brought to the market its current, infringing version of the InterPulse. Even then, Stryker had not conceived a way to make its product reusable without a contaminated suction tube as the '452 patent provides. Clearly, Stryker cannot demonstrate the absence of

**I. Stryker's Early Development Efforts**

In early 1995, Stryker began developing a successor to its existing suction irrigator. A "Concept Consensus" document dated February 23, 1995 sets forth the basic structure and features of the product under development. The product was to have a handpiece, a variety of tips that could deliver irrigation fluid with various different pressures and spray patterns, and suction to aspirate contaminated irrigation fluid and debris. The suction capability was described as follows:

> The suction tube will be located and exposed in the "spine" of the handpiece. The tip design will allow the user of the device to separate the suction portion of the tip (with the suction tube attached) from the handpiece. This feature will allow the user to convert the system from a suction irrigation system to separate irrigation system and suction wand. The tip design is preferred to be axial like the SL+ system, but it may be an "over/under" system similar to Davol.

(S 4510). This design was known as the "detachable suction wand." Mike McGarrity, Stryker's Product Manager for the InterPulse development project, explained:

> Q What is a detachable suction wand?
>
> A It's a -- detachable suction wand was an early design that we looked at with InterPulse, in which you could detach the suction from the spine of the handpiece and replace it or reattach it, and it could operate as a separate suction wand.

(McGarrity Tr. at 27).

It is this design that Stryker disclosed in its April 7, 1995 FDA 510(k) filing. Indeed, Stryker highlighted the capabilities of the detachable suction wand:

> The handpiece may be offered both with and without suction capability.... ***The suction system operates independently of the handpiece irrigation function.*** Once attached to a suction canister/system, the handpiece has continuous suction capability as long as the suction system is turned on. Therefore, the user may collect fluid and debris independent of the activation of the irrigation system.

> The suctioning capability integrated into the handpiece may allow the user to separate a portion of the suction tubing from the handpiece. Once disconnected, ***this tubing allows the user to have a suction system/tubing independent of the handpiece therefore eliminating the need for a separate suction tip***. The detached portion of suction tubing can be reattached or snapped back onto the handpiece by the user. ***This feature provides convenience/ease of use to the user and minimizes additional costs***.

(Stryker Br. Exh. F) (emphasis supplied). In other words, the device was intended to permit the user to detach the suction wand in order to provide separate suction ability *during a single procedure*. There is no reference anywhere in the 1995 510(k) to rendering the handpiece reusable for multiple procedures without a contaminated handpiece, which is the teaching of the '452 patent. Indeed, Stryker's Senior Project Engineer, Bruce Henniges, conceded that the 1995 510(k) submission did not explicitly disclose a reusable handpiece, let alone a handpiece that could be reused without a contaminated suction tube. (Henniges Tr. at 167-71) (Exh. 7).

A design drawing (S 18429, shown at right) depicting Stryker's early design, with the handpiece grooved along the spine to accept the detachable suction wand, shows that the suction wand was independent of the various modular irrigation tips that could be used with the handpiece: there was no single, integrated tip with both suction and irrigation capability.



## II. Davol's Development of the Patented Technology

On or about June 16 1995, two Davol employees, Roger Darois and Glen French, were discussing the need to overcome resistance from wound care practitioners to the use of a disposable pulsed lavage handpiece. The problem was that wounds typically must be treated repeatedly over a period of time, but the handpieces were too expensive to be cost-effective if they were used once and thrown away. Moreover, the handpiece batteries were still viable after a single use, and practitioners considered it wasteful to simply throw the handpiece away.

Messrs. Darois and French realized that if the device could be designed so that the aspirated liquid did not enter the handpiece, the handpiece would remain clean and it could be reused on the same patient for the next wound treatment without fear of contamination. This would permit the handpiece to be reused multiple times (as long as the batteries retained sufficient charge) and the per-use cost would be greatly decreased because only the inexpensive tip would need to be replaced each time. Thus, on June 16, 1995, Mr. French reduced the invention to a complete drawing on paper, and a few days later he forwarded it to another Davol employee, Stephen Albrecht, with a description of the problem that was solved by the invention:

FROM THE DESK OF...

Glendon E. French

6/20

STEVE - cc: RON

AS WE DISCUSSED.

- Glen

PROBLEM: PT CUSTOMERS DON'T WANT TO THROW AWAY SIMPULSE HAND PIECE AFTER EACH USE. "STERILE TECHNIQUE' GIVING WAY TO 'CLEAN TECHNIQUE' IN MANY SITUATIONS.



Davol moved quickly to commercialize the invention, and by February 28, 1996, Davol had completed a functioning prototype. In a March 7, 1996 invention record, the invention was described as follows:

> This resposable [i.e., reusable/disposable] handle/tip system design will incorporate the features of current suction irrigation products already existing out in the field. The difference is that with this new system clinicians can treat patients with reduced cost because only the tip need be disposed. The handle part of the system can be reused…. ***Now that the suction flow does not travel through the handle, the handle may be used again on the same patient for later use.*** Only the tip would have to be replaced.

(DVL 873) (emphasis added). Davol launched its new device to market on or about June 13, 1996, and filed its initial patent application on June 18, 1996. This application matured into U.S. patent 6,200,292. On November 2, 2000, Davol filed a continuation application claiming priority to the initial patent application. That application issued as the '452 patent, the patent in suit, on November 26, 2002.

## III. After Receiving Negative Feedback on the Detachable Suction Wand, Stryker Starts Over With a New Design.

While Davol proceeded to develop and commercialize its invention, Stryker continued to develop its InterPulse device. In early 1996, approximately nine months after the Davol inventors had made the drawing shown above, Stryker was still conducting "Customer Preference Trials," or "CPTs" using prototypes of its new device with the detachable suction wand. The most significant of these CPTs was held at AORN, a national convention of perioperative nurses. Feedback from this trial was unexpectedly negative:

**B. DETACHABLE SUCTION WAND:**

**-OVERALL, NOT A BIG HIT**

**-WILL NOT REPLACE CURRENT YANKAUER TIP DUE TO:**
**1. CUSTOM PACKAGING OF YANKAUER**
**2. TIME TO ATTACH/DETACH WAND**

**-WILL NOT PERFORM AS WELL AS, NOR REPLACE "SUPER SUCKER"**

**-ALL USE SEPARATE SUCTION EXCEPT FOR ONE HOSPITAL**

(S 5471). This unexpected development caused sufficient consternation among Stryker's development team that Bruce Henniges, the lead engineer on the team, felt it necessary on March 20, 1996, to "clear the air" about the impact on the project:

> The air needs to be cleared about the direction of the project due to the concerns about the utility of the Suction Wand and Tip design. We have not moved any scheduled activities, delayed any goals or changed the design. Mike and I have discussed the recent focus group information and the next goal is to get functional CPT units into the field for evaluation. The focus of this CPT activity will be the utility of the complete system with emphasis on the tip and suction system. The results of the CPTs will be evaluated and decisions on the design will be made at that point. This is no different than any other CPT activity which accommodates the development process. I am asking the Development Team to stay focused with the tasks at hand so we can execute a smooth development of the InterPulse Lavage System.

(S 4977). Notwithstanding Mr. Henniges's reassurance that the design had not been changed, Stryker almost immediately thereafter began a complete redesign of the tip system for its new irrigator. In an April 26, 1996 memorandum, Mr. Henniges noted that "it is very likely that the tip system will require redesigning prior to product launch." (S4948). On May 31, 1996, Mr. Henniges described the tip redesign as "quite extensive" and could result in increase costs:

> The engineering team is focusing on redesigning the tip system and improving the gear reliability. The tip redesign is quite extensive and we are sorting out the project impact. The good news is that the new tip system should be less expensive at the component level. This would translate into a overall savings for the final product but the cost for both the labor and packaging may exceed the cost savings and their initial cost estimates.

(S 4930)). Stryker continued to struggle with its tip design until June 27, 1996, when Stryker's development team formalized the new functional specifications for the redesigned tip system, which would eliminate the suction wand design and replace it with a combined suction/irrigation tip with an over/under design. (S31) (Exh. 9). The Functional Specifications Change Form noted that the tip redesign had impacted upon the projects Critical Path, resulting in a significant delay in product launch, and an increase of $330,000 in the project cost. *Id.*

Thus, nine days after Davol's initial patent application, and just over a year after Mr. French of Davol signed the drawing above, Stryker had finally settled on the functional

specifications for its redesigned tip system. Stryker had not yet produced the new tip, let alone launched it to market. In fact, Stryker would not launch its InterPulse device with the new combined suction/irrigation tip until early 1998 – nearly two years after Davol's invention.

## IV. Only After Redesigning The Tip System Did Stryker Begin to Consider How to Make The InterPulse Reusable.

In November, 1996, long before Stryker brought its redesigned product to market, Stryker's development team met with an outside nurse consultant, Kathy Luedtke, to discuss trends in wound care treatment. Shortly thereafter, Mr. Henniges described the "very helpful" insight that Ms. Luedtke offered in critiquing Stryker's proposed device, which had been designed primarily for the orthopedic market, where reuse is not an issue:[12]

> Part of the InterPulse Team had a meeting with Kathy Luedtke about the current trends in wound care management. The discussion focused on wound care management utilizing battery powered pulsed lavage. Her insight was very helpful and there were some interesting ideas generated during the discussion. The InterPulse lavage system has been designed to provide the best fit in our primary market, the orthopedic market. Given that, there are some limitations in the current design preventing it from being a perfect fit in the wound care market. The biggest issues from the discussions are as follows: 1) Reimbursement for any reusable capital equipment; 2) Tip design for deep tunnel wounds; 3) Providing the full range of impact pressures with only a single system (handpiece/tip); 4) System cost; 5) Disposing of a functional system which can last for more than a single use. These issues will be investigated in the next few months and I feel that we should be able to offer a better system design for the wound care market than we currently have with SL+.

(S 4872). As Mr. Henniges explained at deposition, Ms. Luedtke "felt it was a shortcoming to throw a perfectly reusable and functional system away" after a single use, given that it was still capable of pumping fluid and cleaning a wound. (Henniges Tr., 166) (Exh. 7). This, of course, was precisely the insight that Messrs. Darois and French had had a year and a half earlier.

Following Ms. Luedtke's explanation of the problem, Stryker attempted to figure out how to make its InterPulse handpiece reusable. In May 1997, Stryker made a new 510(k) submission to the FDA describing "proposed modifications" to the system that had been the subject of

---

[12] The term "SL+" used in some of Stryker's documents refers to the SurgiLav Plus, the then-existing suction/irrigator that Stryker was seeking to replace with the new InterPulse device.

Stryker's 1995 FDA 510(k) filing. Stryker explained to the FDA that it had developed a way to make its handpiece reusable on the same patient, by providing a "sterile plastic 'plug' that would be inserted into the handpiece after debridement in place of a handpiece tip. The insertion of this plug into the handpiece would allow the handpiece to be stored for subsequent hydrodebridement of the same patient…." (S 16031). As the so-called "predicate device" for its new 510(k) filing, Stryker explicitly referred to Davol's suction-diverter tip, which had been launched to market more than a year earlier. (S 1733, 1756) (Exh. 10). Significantly, Stryker conceded that its new "plug" would not prevent the handpiece from becoming contaminated. To the contrary, as Stryker explained to the FDA:

> The tip and suction path will become contaminated during use. Therefore, the tip will be discarded after each use. The suction tubing will remain, but it does not come into contact with the patient or the irrigation path.

(S 1733) (Exh. 10). In other words, as of May 1997, Stryker still had not figured out – let alone disclosed to anyone – a way to render its InterPulse handpiece reusable without a contaminated suction pathway, as disclosed and claimed in the '452 patent.

Stryker finally launched the InterPulse in January 1998, nearly two years after it received the negative feedback that had caused it to undertake a complete redesign of its tip system. (McGarrity Tr. at 156-61) (Exh. 8). The InterPulse as launched included the combined suction/irrigation tips that the early prototypes and the 1995 FDA 510(k) filing had lacked.

It was not until 1999, however, that Stryker made its product safely reusable without a contaminated suction pathway, with the launch of its Wound Care Replacement Tubing Sets. (Noonan Tr. at 47-48) (Exh. 11). These comprised not only the integrated tips, but also attached lengths of suction tubing. Following the launch of the replacement tubing sets, a user could use the InterPulse, detach the contaminated integrated suction/irrigation tip and contaminated tubing,

and replace all such contaminated parts with new, uncontaminated parts. As Stryker explained on April 28, 1999, in its New Product Release Form for its Wound Care Replacement Tubing Sets, it is that product that permits users to reuse the InterPulse handpiece for wound care without fear of cross-contamination:

> **Product Features:**
> 1. This product features the soft tissue tip (210-312) and the fan spray tip (210-318) packaged with 10 foot of suction tubing. The current design calls for the tip to be pre-attached to the tubing. This product allows a SIPs Handpiece to be used more than once prior to disposal.

(S 1040).

**ARGUMENT: STRYKER IS NOT ENTITLED TO SUMMARY JUDGMENT OF INVALIDITY BASED ON ITS EARLY INTERPULSE DESIGN.**

A patent is presumed to be valid. 35 U.S.C. § 282. To defeat that presumption, Stryker must show by "clear and convincing evidence" that its early InterPulse design anticipates the '452 patent under 35 U.S.C. §§ 102. *Brown v. 3M*, 265 F.3d 1349, 1353 (Fed. Cir. 2001) (challenger has burden of showing anticipation by "clear and convincing evidence."). Stryker has no hope of meeting this burden under either §102(a) or §102(g), and Stryker's motion for summary judgment of invalidity must be denied. "For a prior art reference to anticipate in terms of 35 U.S.C. § 102, every element of the claimed invention must be identically shown in a single reference." *Diversitech Corp. v. Century Steps, Inc*. 850 F.2d 675, 677 (Fed. Cir. 1988). "[A]ny degree of physical difference between the patented product and the prior art, *no matter how slight*, defeats the claim of anticipation." *American Permahedge, Inc. v. Barcana, Inc.*, 857 F. Supp. 308, 318 (S.D.N.Y. 1994) (emphasis in original); *accord, E.I. du Pont de Nemours & Co.*

Given the factual disputes between the parties on the fundamental question of the nature of the early InterPulse design on which Stryker relies, Stryker cannot "show that there is no genuine issue as to any material fact," as Rule 56(c) requires. Stryker's own internal documents and the testimony of its personnel demonstrates the deficiency of Stryker's showing. As described above, the InterPulse device as it existed in 1995, on which Stryker relies completely for its argument under 35 U.S.C. § 102, fundamentally differed from the accused InterPulse product that Stryker finally launched to market in early 1998. Moreover, that early design did not permit uncontaminated reuse. The early InterPulse design lacked at least the following elements of the '452 patent claims in suit:

**Claim 9**:

- a detachable, discardable suction and irrigation tip . . . the tip comprising: an irrigation tube [and] a suction tube
- the suction tube [of the combined suction/irrigation tip] having a fluid path that channels aspirated irrigation fluid externally of the handpiece
- the suction tube and irrigation tube [of the combined suction/irrigation tip] being detachable together from the handpiece
- whereby the tip can be discarded, enabling the handpiece to be reused.

**Claim 10**:

- the tip comprising … a suction tube for aspirating irrigation fluid from the irrigation site;
- aspirating spent irrigation fluid from the irrigation site through the suction tube of the tip;
- thereafter detaching the tip, including the irrigation tube and suction tube together from the handpiece and discarding them; and
- attaching an unused discardable suction and irrigation tip to the handpiece in readiness for another procedure.

**Claim 20**: Each of the missing elements described above with respect to Claim 9, from which Claim 20 depends, plus:

- at least a portion of the fluid path comprises suction tubing detachably connectible to the tip.

**Claim 21**: Each of the missing elements described above with respect to Claim 9, from which Claim 21 depends, plus:

- the suction tube, irrigation tube [of the combined suction/irrigation tip] and suction tubing are detachable with respect to the handpiece and are discardable together.

**Claim 23**: Each of the missing elements described above with respect to Claim 9, from which Claim 23 depends.

**Claim 24**: Each of the missing elements described above with respect to Claim 10, from which Claim 24 depends.

**Claim 26**: Each of the missing elements described above with respect to Claim 9, from which Claim 26 depends, plus:

- a flexible splash shield mounted on the [combined suction/irrigation] tip.

**Claim 28**: Each of the missing elements described above with respect to Claim 26, from which Claim 28 depends.

**Claim 30**: Each of the missing elements described above with respect to Claim 9.

Because the early InterPulse device did not include each element of any (let alone all) of the claims in suit arranged in the same way, *see Diversitech,* 850 F.2d at 677, the Court should reject Stryker's motion for summary judgment of invalidity.

As an afterthought, Stryker presents the argument that its customers re-used the InterPulse handpieces on their own. (Stryker Br. at 18.) Stryker appears to bring up this "fact"[13] in an effort to show that plaintiffs' invention was "known or used by others in this country … before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). This argument is frivolous. The InterPulse product was not launched to the market until January 1998 (McGarrity Tr. at 156-61) (Exh. 8), long after Davol's June 1995 invention date and its June 1996 market launch and patent filing date. Even if Stryker's bald assertion were supported by something

[13] In any event, this is not "fact" but hearsay, which may not serve as the basis for a summary judgment motion. *See* Fed. R. Civ. P. 56(e) (summary judgment motion must be supported by "such facts as would be admissible in evidence"); *Noviello v. City of Boston*, 2005 WL 357671 (1st Cir. Feb. 16, 2005). Mr. Crotty conceded that his only source for this information was what others told him, that he could not remember who told him about the alleged reuse, and that he had no way to verify the statements. (Crotty Tr. at 19-20) (Exh. 12).

more than hearsay, it would be irrelevant to the invalidity argument because it could not have occurred prior to Davol's invention.[14]

**CONCLUSION**

For the foregoing reasons, the Court should deny Stryker's motion for summary judgment of non-infringement or invalidity, and grant Davol's cross-motion for summary judgment of infringement.

Dated: July 27, 2005

Respectfully submitted,

Mark A. Pogue (#3441)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
Tel. (401) 274-9200
Telecopy (401) 276-6611

---

[14] The Federal Circuit has emphasized that to invalidate a patent under section 102(a) "based on prior knowledge or use, that knowledge or use must have been available to the public." Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998) (and authorities cited therein). But the information disclosed in Stryker's 1995 FDA 510(k) filing was not public at all. To the contrary, Stryker emphasized the confidential nature of that information:

> Stryker's submission of this 510(k) is considered confidential. . . . Stryker considers certain information as trade secret, or confidential commercial information, and as such has indicated this on all product prints. Additionally, prior to Freedom of Information Release, Stryker will purge other information that it deems confidential.

(Stryker Br. Exh. F.) Thus, as a matter of law, Stryker's 1995 510(k) filing is not § 102(a) invalidating prior art. Cf. Del Mar Eng'g Labs. v. United States, 524 F.2d 1178, 1182 (Ct. Cl. 1978) ("classified documents whose security classification was not removed until after the invention of the patent in suit are not prior publications or evidence of prior knowledge as they are not 'public' within the meaning of s 102(a)."). The Court need go no further to reject Stryker's motion for summary judgment of § 102(a) invalidity.

Stryker's § 102(g) argument must fail for another reason as well. Section § 102(g) requires a prior conception and reduction to practice of the invention by another. *Texas Instruments, Inc. v. ITC*, 988 F.2d 1165, 1177 (Fed. Cir. 1993). The facts in evidence demonstrate that Stryker did not conceive, let alone reduce to practice, a way to make its InterPulse handpiece reusable without a contaminated suction path until 1999. And, even assuming that Stryker could meet that burden with respect to its 1995 InterPulse design, it clearly "abandoned, suppressed or concealed" that alleged invention by not making it public until 1999.

Claire Laporte (*admitted pro hac vice*)
Mitchell J. Matorin
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Tel. (617) 832-1000

*Attorneys for plaintiffs C.R. Bard, Inc. and Davol Inc.*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 27th day of July, 2005, I caused a copy of the within to be served as follows:

VIA HAND DELIVERY
Joseph Avanzato, Esq.
ADLER, POLLOCK & SHEEHAN
2300 Financial Plaza
Providence, RI 02903

VIA FEDEX
Gregory J. Vogler, Esq.
Sharon A. Hwang, Esq.
McANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661